UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUNE WUOPIO,

        Plaintiff,

v.

BRANDON BOARD OF EDUCATION
et al.,

        Defendants.

_____/

Case No. 08-11371

HON. SEAN F. COX
United States District Judge

OPINION & ORDER

Plaintiff June Wuopio ("Wuopio") brings this § 1983 action against the Brandon Board of

Education, a/k/a Brandon School District ("the School District") and several of its officials.  The

matter is currently before the Court on the Defendants' Motion for Summary Judgment [Doc. No.

51].  The parties have fully briefed the issues, and a hearing was held on July 9, 2009.  For the

reasons below, the Court **DENIES** the Defendants' Motion with respect to Wuopio's First

Amendment Retaliation Claim [Count I], and with respect to the Defendants' claimed

entitlement to qualified immunity.  However, the Court **GRANTS** the Defendants' Motion [Doc.

No. 51] regarding Wuopio's *Monell* claim against the School District [Count I], as well as on

Wuopio's Employee Right to Know Act and Procedural Due Process Claims [Counts II and III].

BACKGROUND

Wuopio started working for the School District in 1980, and since 1987 had served as

Director of Community Education, where she managed the School District's after-school,

alternative education, childcare and Head Start programs.  Wuopio was a member of an

1

administrator's union ("the Union"), and as such could only be fired for just cause.  From the time of her hire until the events in question in this lawsuit, Wuopio had a spotless disciplinary record, both in terms of formal and informal discipline.

Miller Becomes Superintendent Over Wuopio's Voiced Opposition

Around June of 2004, the Superintendent of the School District, Bart Jenniches, announced that he was retiring.  The Brandon School Board ("the Board") invited parents and staff to participate in the selection process for a new superintendent, which Wuopio participated in along with approximately thirty other volunteers.  Wuopio participated in, among other things, the interviews of the two finalist candidates for the position: Dr. Nancy Campbell ("Campbell"), and Mr. Tom Miller ("Miller").

At the February 15, 2005 Board meeting, the Board was scheduled to vote on filling the open superintendent position.  Wuopio was the only administrator at the meeting to express a preference for Campbell over Miller, though other, non-administrative staff members also supported Campbell.

After Wuopio made her remarks in favor of Campbell, Defendant Kenneth Quisenberry, a member of the Board, allegedly stated in a menacing tone that he "wished you [Wuopio] hadn't said that." [Wuopio Dep., p.75].  Quisenberry denies making the statement, though others present at the meeting remember the comment. [*See*, e.g., Apel Dep., p.19; Rader Dep., pp.14-15; Keeble Dep., p.24].

Following Wuopio's comments, the Board recessed and privately discussed their views.  Board member Gina Muzzarelli testified that unanimity was "extremely important," and that it was important for the Board to be "very solid and collective. . . unified." [Muzzarelli Dep., p.99].

2

Although the Board had hoped for a unanimous vote, in fact Board member Karyn Milligan was the sole dissenting vote in favor of Campbell. After the meeting, the head of HR for the School District, Debbie Apel, saw Quisenberry angrily scolding Milligan in a back hallway, his finger in her face and appearing very upset. [Apel Dep., p.22]. After the meeting, Wuopio's comments voicing opposition to Miller were reprinted in the local newspaper. [*See* Pl.'s Ex. A].

<u>Miller Terminates Wuopio's Position Due to Alleged Budgetary Constraints</u>

After being hired by the Board as Superintendent, Miller hired Marion Horowitz ("Horowitz") to be his Assistant Superintendent. Horowitz directly oversaw Wuopio, making Wuopio the only administrator so assigned under Horowitz. According to Apel, the District's HR Manager, Horowitz immediately set about looking to uncover negative information on Wuopio's job performance. [Apel Dep., p.33]. Apel further testified that Miller's and Horowitz's approach to Wuopio was "unprecedented" in the District [Apel Dep., pp.32-33], a comment echoed by Wuopio's Union President, who testified that "protocol wasn't followed" in investigating Wuopio, and that "there was more. . . attention being paid to her than to others." [Rodak Dep., pp.31-33].

In January of 2005, Miller called Wuopio into his office and told her he wanted her to resign. He claimed that, if she resigned voluntarily, Miller would write Wuopio a glowing letter of recommendation, give her a positive final evaluation, and buy out her sick days. [Wuopio Dep., p.189]. Wuopio's union representative was given a copy of the proposed recommendation letter [Pl.'s Ex. E], describing Wuopio as a "tremendous" leader "providing leadership" and "outstanding service," and that her contributions would "truly be missed" as she would be an

3

"asset to any organization." Wuopio considered the offer, but declined. The very next day, Miller called Wuopio into his office and gave her both a written and a verbal warning [Def.'s Ex. II].

Later, Miller recommended to the Board that Wuopio's position be eliminated. While Miller posited that the School District would save considerable funds by eliminating the position, other evidence supports the argument that financial information regarding the cut was not available when Miller made the recommendation. [Kelly Dep., pp.64-65]. Further, despite the Defendants' claims that funding had to be cut across the board by as much as $600,000 to $1,000,000 after the 2005-2006 school year, other information shows that the 2006-2007 budget was actually *higher* than the prior year by over $200,000. [Pl.'s Ex. J]. Further, the School District's cash reserves remained on a steady increase throughout the time in question.

At the same time that Wuopio's position as Director of Community Education was eliminated from the School District, the Principal at the Intermediate School announced his retirement. As a union employee, Wuopio had a right to post for the open position. A finance department employee, Gary Kelly, testified at deposition that Miller told him he would not allow Wuopio to post for the position, however. [Kelly Dep., p.79]. Instead, despite purported budgetary cutbacks, Miller created a new position as Assistant Principal at the Intermediate School, which he allowed Wuopio to post for in exchange for her not posting for the Principal position. [Wuopio Dep., p.205]. Once Wuopio left employment with the School District, this position was not filled by another employee. [Muzzarelli Dep., pp.86-87].

<u>Wuopio is Forced to Resign Over Alleged Head Start Funding Discrepancies</u>

From the earliest days Howowitz and Miller had been with the School District, Wuopio

4

voiced concerns about the Head Start budget which went unanswered.  Specifically, Wuopio's
subordinate, Eileen Herrell, worked on Head Start issues part-time, and there was a budgeting
discrepancy as between the amount the School District would be responsible for her pay and the
amount that should properly be billed for Head Start activities.  Wuopio inquired multiple times
with Horowitz, her superior, regarding Herrell's proper classification. [Wuopio Dep., pp.113-15].
Horowitz downplayed Wuopio's concerns, stating that they would fix the problem later.  *Id*.

Wuopio went on sick leave in March of 2006, at which time Herrell reported directly to
Horowitz.  During that time, Horowitz invited Lynn Crotty, who was in charge of the Head Start
program for Oakland County, to review the books for the School District and help set up the new
budget.  Crotty was never told that Wuopio had been raising concerns about Herrell's pay
classification for months without guidance from, among others, Horowitz herself. [Crotty Dep.,
pp.193-94].  Despite the problems Crotty found in the School District's Head Start budget as a
result of these concerns, however, Crotty did not conclude that anything had been fraudulently or
intentionally done incorrectly.  *Id*. at 159-60.

Armed with perceived concerns regarding the Head Start budget, in August of 2006
Miller again sought to remove Wuopio from the School District.  Wuopio was the only
individual disciplined by the District for the Head State budget discrepancies, despite the fact that
Wuopio had previously raised her concerns with both Kelly and Horowitz.

Miller told Wuopio that, if she did not resign, he would recommend her termination to the
Board.  [Pl.'s Ex. X].  Wuopio also alleges that Miller threatened Wuopio, stating that her son, a
student in the School District, would potentially be subject to reprisal.  *Id*.  While Wuopio's
union president agreed that Wuopio could have explained herself to the Board, and while

5

Wuopio also could have filed a grievance under the union's collective bargaining agreement ("CBA"), Wuopio elected instead to resign.

<u>Procedural History of the Instant Lawsuit</u>

Wuopio filed suit on February 21, 2008 in the Oakland County, Michigan Circuit Court, alleging three causes of action: 1) First Amendment Retaliation under 42 U.S.C. § 1983 and Michigan's Elliot Larsen Civil Rights Act; 2) a violation of Michigan's Bullard-Plawicki Employee Right to Know Act; and 3) a violation of her right to Due Process under the Fourteenth Amendment of the United States Constitution. Wuopio named as defendants to the lawsuit the School District, Miller, Horowitz, School Board President Beth Nuccio, Quisenberry, and Muzzarelli (collectively, "the Defendants").

Citing federal question jurisdiction, the Defendants removed this action to federal court on March 31, 2008. The case is currently before the Court on the Defendants' Motion for Summary Judgment [Doc. No. 51], wherein the Defendants seek judgment as a matter of law on all three counts in Wuopio's complaint.

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*

6

*v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must

set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

I.  Wuopio's Claim for First Amendment Free Speech Retaliation.

In Count I of her Complaint, Wuopio alleges a violation of Section 1983 and the ELCRA

for First Amendment free speech retaliation. In their Motion for Summary Judgment [Doc. No.

51], the Defendants proffer two main arguments why Wuopio can not establish a prima facie case

of First Amendment retaliation: 1) Wuopio was not engaged in constitutionally protected speech;

and 2) Wuopio can not establish that her speech was a substantial factor in any adverse

employment action. [Def.'s Br., Doc. No. 51, pp.3-10]. The Court **DENIES** summary judgment

with respect to both arguments.

To state a prima facie cause of action for retaliation in violation of the First Amendment

under Section 1983, Wuopio must show that: 1) she engaged in constitutionally protected speech;

2) she was subjected to an adverse action or was deprived of some benefit; and 3) the speech was

a substantial or motivating factor in the adverse employment action. *Brandenburg v. Hous. Auth.*

*of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001).

A.  Wuopio's Constitutionally Protected Free Speech.

The Defendants argue that Wuopio's speech at the February 16, 2005 Board meeting was

not constitutionally protected speech because Wuopio was a confidential and/or policymaking

employee speaking about policy issues. [Def.'s Br., Doc. No. 51, pp.5-7]. Wuopio argues that

her position was not a confidential and/or policymaking one, and even if so, her speech at issue

7

was not policy-related.

To satisfy the first prong of a prima facie case of First Amendment retaliation, a plaintiff must show that 1) she was engaged in constitutionally protected free speech; 2) she was speaking as a citizen addressing matters of public concern; and 3) her interest in addressing those matters of public concern outweighs her employer's interests in promoting efficiency in its services. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

Where a confidential or policymaking public employee is discharged for speech related to his political or policy views, the balance favors the government as a matter of law. *See, e.g., Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980). Elaborating upon *Elrod* and *Branti*, the Sixth Circuit explained that "[p]ermitting the government to dismiss employees who fall within the policymaking or confidential categories when they voice opinions on political or policy-related issues is an appropriate means" of securing the government employer's ability to provide services. "[C]onfidential or policymaking employees may be discharged merely for their political affiliations, without any on-the-job acts even hinting at disloyalty or insubordination." *Latham v. Office of the Attorney General*, 395 F.3d 261, 266-67 (6th Cir. 2005). However, the Supreme Court has also stated that it is the employer who bears the burden of proving that an employee falls into the confidential or policymaking group. *Branti*, 445 U.S. at 518.

The Defendants argue that Wuopio, as a Michigan public school principal, is a confidential or policymaking public employee and therefore may be discharged for speaking about policy issues. [Def.'s Br., Doc. No. 51, p.6]. While the Michigan Court of Appeals, in *Maygar v. Clio Area School District*, 2006 WL 1115596, *5 (Mich. Ct. App. April 27, 2006), did

8

hold that a school principal was such an employee, the facts of this case demonstrate that Wuopio never was a principal.  Indeed, Miller created a new position as Assistant Principal, a subordinate position, in an effort to keep Wuopio from posting for the open principal position at the Intermediate School. [Wuopio Dep., p.205].

Defendants further argue that Wuopio's capacity as Director of Community Education was a policymaking position - in large part due to the Defendant's characterization that Wuopio "developed" programs under her control. [Def.'s Br., Doc. No. 51, p.6].  This argument is without merit for two reasons.  First, due to Miller's elimination of the position, Wuopio was *no longer* the Director of Community Education.  Furthermore the Defendants erroneously presuppose that any position in which an employee "develops" something could be considered a policymaking position.

In the instant case, the Defendants have not satisfied their burden of proving that, as a matter of law, Wuopio was a confidential or policymaking employee of the Brandon School District.  Rather, the facts show that, while Wuopio was an administrator for the Brandon School District, she did not play a significant role in the creation of district policy.  Further, Defendants have not shown any facts "demonstrat[ing] that" Wuopio's loyalty was a prerequisite "requirement for the effective performance" of her duties.  *Id*. As such, the Court **DENIES** the Defendants' Motion for Summary Judgment [Doc. No. 51] on that ground.

B. Wuopio's Alleged Free Speech as a Substantial Factor in an Adverse Employment Action Against Her.

Viewed in the light most favorable to Wuopio, the non-moving party, the evidence in this case demonstrates sufficient fact issues regarding whether the Defendants caused Wuopio to

suffer an adverse employment action in retaliation for her speech on February 16, 2005. As such, the Court **DENIES** the Defendants' Motion for Summary Judgment with respect to Count I of Plaintiff's Complaint.

As part of Wuopio's prima facie case, she must prove "that the speech was a substantial or motivating factor in the adverse action." *Brandenburg*, 253 F.3d at 897. In order to meet that threshold, Wuopio must "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003). "[T]he nonmoving party cannot rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent." *Taylor v. Keith*, 338 F.3d 639, 646 (6th Cir. 2003). Put another way, Wuopio must show that the Defendants would not have acted as they did if Wuopio had not exercised her constitutional rights. *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002).

As Wuopio argues, the facts of the instant case demonstrate a genuine issue of material fact whether Wuopio was suffered an adverse employment action because of her speech on February 16, 2005. Defendants have come forward with no evidence to rebut Wuopio's claim that her record was spotless for the twenty-five years leading up to when she spoke out against Miller. In the face of the Board, who felt unanimity behind Miller's candidacy was best for the School District, Wuopio was one of, if not the only, administrator to speak up for Campbell.

Wuopio alleges that, immediately after she spoke at the Board meeting, Quisenberry immediately made a threatening comment to her. Though Quisenberry denies making the comment, it was overheard by several other witnesses at the hearing. While the Defendants argue that other individuals who spoke out against Miller at the meeting did not suffer known

10

adverse employment actions, such does not conclusively show that Wuopio was not targeted herself.  Quisenberry also confronted Board member Karen Milligen - the only holdout vote against Miller - after her vote.

After Miller got the job over Campbell, Miller immediately hired Horowitz, and made Wuopio the only administrator assigned to report directly to Horowitz.  Viewed in the most favorable light towards Wuopio, the evidence suggests that Horowitz immediately went about investigating Wuopio's conduct, seeking out negative information, with the president of Wuopio's union stating that "more attention [was] being paid to her than others" and that "protocol wasn't being followed." [Rodak Dep., pp.32-33].

By January of 2006, Miller was openly soliciting Wuopio's resignation with offers of positive reviews and glowing recommendations.  When Wuopio did not resign, Miller censured her the very next day.  Her position as Director of Community Education was downsized, purportedly for budgetary reasons, despite conflicting information that the District's budget was growing and the District's financial health was sound.

After claiming to have asked Horowitz for months to clarify provisions of the Head Start budgeting, Wuopio herself was blamed for discrepancies in the budget involving one of Wuopio's subordinates.  Ultimately, this occurrence led to Miller's decision to recommend Wuopio's termination to the Board, despite other accounting and budgetary mistakes being committed by other administrators without similar reprisal.

On these facts, Wuopio has raised genuine issues of material fact sufficient for her First Amendment retaliation claim to survive summary judgment.  For these reasons, the Court **DENIES** the Defendants' Motion for Summary Judgment [Doc. No. 51] with respect to

11

Wuopio's First Amendment Retaliation claim [Count I].

II.  Qualified Immunity for The Defendants On Wuopio's First Amendment Claim.

The Defendants argue that, even if Wuopio can satisfy her prima facie case of First Amendment retaliation, they are entitled to qualified immunity.  The Court disagrees, and **DENIES** the Defendant's Motion for Summary Judgment [Doc. No. 51] on that ground.

Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*., 457 U.S. 800, 818 (1982).  The doctrine of qualified immunity provides immunity from suit rather than a mere defense to liability.  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).

Qualified immunity claims are examined in two stages: 1) whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and 2) whether that right was clearly established.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Courts are now free to examine these factors in whatever order suits the circumstances of the particular case at hand.  *Pearson v. Callahan*, 129 S.Ct. 808 (2009).

In this case, viewed in the light most favorable to Wuopio, Miller and the Defendants retaliated against Wuopio for exercising her First Amendment right to support Campbell's candidacy.  A public official's retaliation against an individual for exercising First Amendment rights is a clearly established violation of Section 1983.  *See Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998).  As such, the Defendant's Motion for Summary Judgment [Doc. No. 51] on qualified immunity grounds is **DENIED**.

12

III.  Wuopio's *Monell* Claim Against The School District.

Also in Count I of her Complaint, Wuopio brings a *Monell* claim for § 1983 liability

against the School District.  The Defendants argue that summary judgment should be granted in

their favor on this claim because neither the individual board members themselves, nor either

Miller or Horowitz, were final decision-makers for the School District.  The Court agrees, and

therefore **GRANTS** the Defendants' motion on that ground.

As a general rule, municipal governments or agencies like the School District are not

liable for the § 1983 violations of their agents under the tort doctrine of *respondeat superior*.  *See*

*Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691 (1978).  Instead, the

government entity is only liable under § 1983 where the alleged injury was caused by an

identifiable policy or custom, or where the entity, "through its deliberate conduct. . . , was the

moving force behind the injury alleged." *Bd. of the County Comm'rs of Bryan County v. Brown*,

520 U.S. 397 (1997).

With respect to Miller and Horowitz, the Defendants argue that they did not possess final

authority to establish municipal policy with respect to the action ordered.  "To qualify as a "final

policymaking official," a municipal officer must have the responsibility and authority to

implement final municipal policy with respect to a particular course of action." *Pembaur v. City*

*of Cincinnati*, 475 U.S. 469, 481 (1986).  The question of who possesses such final authority is

one of state law.  *Id*. at 483.

Under Michigan law, only the School Board retains ultimate authority to hire or fire a

superintendent, principal, or assistant principal.  *See* M.C.L. § 380.1229.  The Sixth Circuit, in

*Adkins v. Bd. of Ed.*, 982 F.2d 952, 959 (6th Cir. 1993), held that, under a similar state law in

13

Kentucky, a superintendent cannot be the final decision-maker in recommending employment action because only the School Board has such authority.

Wuopio argues that the Board "delegated to Miller final authority over the actions he took against Wuopio in August 2006." [Pl.'s Br., Doc. No. 75, p.22].  However, no evidence of such delegation has been proffered to the Court in this matter; indeed, the evidence shows that Miller threatened to *recommend Wuopio's termination to the Board* if Wuopio did not resign. Similarly, Horowitz also did not possess final authority over terminating Wuopio.

With respect to the named individual members of the School Board, these individuals likewise cannot be found to be final decision-makers for the School District because the members could not individually exercise their legislative power.  Under Michigan law, "individual board members' viewpoints are not relevant since the board exercises its power as a collective entity and not as individuals." *Wayne County Sheriff v. Wayne County Bd. of Comm'rs*, 148 Mich. App. 702, 705 (1983).

For these reasons, Wuopio has not evidenced a genuine issue of material fact regarding the School District's potential § 1983 *Monell* liability, and the Court therefore **GRANTS** the Defendants' Motion for Summary Judgment with respect to the Brandon Board of Education.

IV.  Wuopio's Bullard-Plawicki Employee Right to Know Act Claim.

In Count II of her complaint, Wuopio alleges a violation of Michigan's Bullard-Plawicki Employee Right to Know Act, M.C.L. § 423.501 *et seq*. ("ERKA").  The Defendants argue that the Court should grant summary judgment in their favor on this cause of action, as "Plaintiff had access to the [personnel] file each time she requested it." [Def.'s Br., Doc. No. 51, p.23].  The Defendants further argue that as soon as Wuopio objected to handwritten notes regarding the

14

School District's investigation of her not being included in the file, the School District provided

Wuopio with copies of that information.  *Id*.

In response, Wuopio argues that the handwritten notes were withheld by the Defendants

on several occasions before thirty-four pages of such notes were finally produced after this

lawsuit had been filed. [Pl.'s Br., Doc. No. 75, p.22].  Wuopio argues that this delay, lasting well

over a year, amounted to a "total denial of certain documents" until the lawsuit was filed.  *Id*. at

23.  Wuopio further argues that testimony from HR Director Debbie Appel proves that such

withholding was not a good-faith misunderstanding, but rather evidences an intent to keep such

documents from Wuopio.  *Id*.

ERKA regulates employees' review of personnel records, provides criteria for this

review, describes information which must be contained in the records, and provides penalties for

violations of the act.  *See* M.C.L. § 423.501 *et seq*.  M.C.L. § 432.503 provides that "[a]n

employer, upon written request, shall provide the employee with an opportunity to periodically

review . . . the employee's personnel record."  As this Court has previously noted, ERKA "does

not contain any specific time requirement for production of a copy of an employee's employment

record. . . ."  *Scuderi v. Monumental Life Ins. Co.*, 344 F.Supp. 2d 584, 603 (E.D. Mich. 2004).

ERKA further provides that "[a]fter the review provided in [Section 503], an employee may

obtain a copy of the information or part of the information contained in the employee's personnel

record."  M.C.L. § 423.504.

In defining the contents of a "personnel file" for purposes of ERKA, the Michigan

Legislature erred on the side of inclusiveness:

"Personnel record" means a record kept by the employer that identifies the employee, to

15

the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, *or disciplinary action*. . . .

M.C.L. § 423.501(1)(c) (emphasis added).  In the context of a promotion, the Michigan Court of Appeals has held that handwritten notes during an employee evaluation should properly be included in an employee's personnel record:

> We hold that the handwritten notes are a record kept by the employer that identifies an employee.  Moreover, the notes have been used relative to that employee's qualifications for promotion and, therefore, should have been made available to [the employee].

*Michigan Professional Employees Society v. Dep't of Natural Resources*, 192 Mich. App. 483, 500 (1992).  As in *Michigan Professional Employees Society*, in the instant case the handwritten notes at issue identify Wuopio, and were used for an enumerated purpose in the statute: in this case, disciplinary action.  Therefore, the Court finds the handwritten notes in this case should properly have been included within Wuopio's personnel file.

ERKA provides employees the right to file an action "to compel compliance [by the employer] with this act."  M.C.L. § 423.511.  That section also enumerates the possible penalties for violations of ERKA:

> . . .[T]he court shall award an employee prevailing in an action pursuant to this act the following damages:
> (a)  For a violation of this act, actual damages plus costs.
> (b) For a *wilful and knowing* violation of this act, $200.00 plus costs, reasonable attorney's fees, and actual damages.

M.C.L. 423.511(a)-(b) (emphasis added).  Thus, two issues become relevant to Wuopio's ERKA cause of action: 1) whether the Defendants' tardy production of the handwritten notes is a "violation" of ERKA; and if so, 2) whether that violation was "wilful and knowing."  As Wuopio

16

has not demonstrated a genuine issue of material fact as to either of these issues, the Court

**GRANTS** the Defendants' Motion for Summary Judgment with respect to Wuopio's ERKA

claim [Count II].

    A.  <u>There is No Evidence That Any Violation Was "Wilful and Knowing."</u>

Assuming *arguendo* that the Defendants' withholding of the handwritten notes was a

violation, there is no evidence that such violation was "wilful and knowing" such to warrant a

$200.00 fine plus attorney fees.

Wuopio contends that there was a conscious effort by the Defendants to deprive Wuopio

of information related to their Head Start investigation. In support of that claim, however,

Wuopio relies solely upon the deposition testimony of Debbie Apel. [Pl.'s Br., Doc. No. 75, pp.

23-24]. Citing page 59 of Apel's testimony, Wuopio claims that "[t]he head of HR testified that

these documents were kept from her, and she did not know of them." *Id*. at 23. However, Apel's

testimony on the subject, in its entirety, does not support that assertion:

> A: . . . my message to all the administrators was always to make sure anything that
>     was relevant to an employee went in their file.
> Q: Did stuff - -
> A: The employee would be aware of if there was any performance issues as well
>     as I always told them if there was anything that came through that was
>     positive, you know, whether it be a letter from a parent, or, you know, a
>     nice card or anything. I said, pass it along so we can have it in their file.
> Q: Marian Horowitz had an investigation notebook that she was keeping. Did that
>     ever go in June's personnel file?
> A: No, I never got a copy of it.
> Q: There were a bunch of notes that were generated at some point about, you
>     know, supposedly in parts of these termination proceedings for June.
>     Were those ever in her personnel file?
> A: Not that I'm aware of, no.
> Q: So, wherever else those were kept, in whatever other file, you just don't know
>     who kept those?
> A: No, I wasn't aware of those.

17

> Q: June asked you for her file and to come in and see it.
> A: Right.
> Q: And when she came in to see her file, none of that, the investigation notebook,
>     none of the information about these termination proceedings, none of that
>     was in there, right?
> A: The only thing that was in there was the write up, the official write up that
>     Marian had done on her performance.
> Q: If June wanted to go back and look at what are they claiming that, you know, I
>     did wrong and what was the basis for all these actions against me, she
>     came one or two different times to look at that?
> A: Right.
> Q: And she wouldn't have been able to see it.
> A: There wasn't anything regarding that in there.

[Apel Dep., Def.'s Ex. G, Doc. No. 51, pp.59-60].

The Apel deposition does not support Wuopio's argument that the Defendants wilfully or knowingly withheld the handwritten notes from Wuopio. Indeed, the testimony quoted *supra* is entirely consistent with the Defendants' argument that they made a good-faith mistake regarding what should have gone into the personnel file. [*See* Def.'s Br., Doc. No. 51, p.25].

This Court has held in a prior case that a "good faith dispute" concerning the contents of a personnel file is not a "willful violation" of ERKA. *McCann v. Midland County Educational Services Agency*, 2008 WL 2559281, *14 (E.D. Mich. June 23, 2008). On the evidence presented, Wuopio has not shown a genuine issue of material fact for trial regarding the wilful or knowing conduct by the Defendants in withholding the handwritten notes.

B. <u>Wuopio's Claim for "Mere Delay" Is Insufficient to Find an ERKA Violation</u>.

This Court's opinion in *Scuderi*, factually analogous to the instant case, demonstrates why the Defendants' withholding of the handwritten notes is not even a good-faith violation of ERKA. In *Scuderi*, the Court held that an employer did not violate ERKA merely due to their delayed response to a terminated employee's request for a copy of her personnel file. *Scuderi*,

18

344 F.Supp. at 604.

The *Scuderi* Court began by noting that the purpose of ERKA was "to provide a method for ensuring that erroneous employment information that might harm an employee is corrected by providing employees an opportunity to review and dispute the information contained in their personnel files." *Id*. The Court then held as follows:

> Given this purpose and the absence of any time limit in the Act for an employer's compliance with an employee request for a copy of his/her personnel record, the Court finds that, where, as here, there is no evidence of willful withholding of an employee's file, *delay alone in the production of a copy of the record is not a violation of the Act*. This is particularly true in this case where Plaintiff has not alleged that her file contained any false or incorrect information, does not dispute the veracity of [the employer's] explanation for the three-month delay in producing a copy of her file, and has not shown that she was prejudiced in any way by the delay.

*Id*. (emphasis added). Furthermore, *Scuderi* found irrelevant the fact that the employee's record was not provided until after the employee had filed suit under ERKA. The *Scuderi* Court then concluded as follows:

> Plaintiff has neither alleged nor demonstrated that she would have done anything different had she been provided her personnel file any sooner or that the delay had any impact on her lawsuit. The Court will therefore grant Defendant's Motion for Summary Judgment on Plaintiff's [ERKA] claim. . . .

*Id*.

As explained *supra*, there is no evidence that the Defendants wilfully or knowingly withheld the handwritten notes from Wuopio. In fact, the notes were immediately provided to Wuopio when she made a specific request for their production. Wuopio has also made no showing that her delay in receiving the documents, although somewhat more lengthy than in other reported cases, caused her any prejudice.

19

Further undercutting any claim Wuopio could make regarding prejudice, while Wuopio's personnel file may not have originally contained the handwritten notes regarding her disciplinary investigation, her personnel file did contain the final report prepared by Marian Horowitz.  Thus, while Wuopio remained entitled to inspect the handwritten notes, much of the information contained within was cumulative of information Wuopio already had access to.  Wuopio has brought forth no evidence showing that there were material discrepancies between the handwritten notes and the final report.  As Wuopio has not evidenced a genuine issue of material fact regarding any prejudice she may have suffered, the Court **GRANTS** the Defendant's Motion for Summary Judgment with respect to Wuopio's ERKA Claim [Count II].

V.  Wuopio's Procedural Due Process Claim Under § 1983.

In Count III of her Complaint, Wuopio alleges that the Defendants twice violated her right to procedural due process by: 1) "engag[ing] in a sham [pre-termination] proceeding intended to suggest Due Process, when in fact the outcome was predetermined from the outset[,] [Pl.'s Complaint, Doc. No. 1, ¶81]; and 2) "affording her no post-termination process."  *Id*. at ¶82.  For the reasons below, the Court **GRANTS** the Defendant's motion for summary judgment with respect to this Count.

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution "provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally adequate procedures."  *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 541 (1985).  Courts undertake a two-step analysis when considering claims for the violation of due process rights.  *Leary v. Daeschner*, 228 F.3d 729, 741-42 (6th Cir. 2000).  The first step

20

determines whether the plaintiff has a property interest entitled to due process protection.[1]  *Id*. at 741.  Second, if the plaintiff has such a protected property interest, the court must then determine what process is due.

In the context of employment rights, "the Supreme Court has explained that the root requirement of the Due Process clause is that an individual be given the opportunity for a hearing *before* he is deprived of any significant property interest."  *Mitchell v. Frankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (internal quotations omitted)(emphasis in original).  Pre-termination hearings "need not be elaborate."  *Loudermill*, 470 U.S. at 545.  Rather, the public employee "is entitled to oral or written notice of the charges against him, and explanation of the employer's evidence, and an opportunity to present his side of the story."  *Id*. at 546.  As outlined below, Wuopio waived her right to a pre-termination proceeding, as well as to a post-termination proceeding.

## A.  Wuopio Waived Her Right to a Pre-Termination Hearing.

It is undisputed that when Miller confronted Wuopio about the Head Start discrepancies in August 2006, Miller informed Wuopio that he was going to recommend that the Board terminate Wuopio's employment for cause.  It is also undisputed that Wuopio was offered an opportunity to explain herself in front of the Board, and that Wuopio could have availed herself of the grievance procedures available to her through the CBA.  Wuopio chose not to avail herself of any of these options, however, and instead tendered her resignation.  Wuopio now alleges that, as a result of these actions by the Defendants, she was denied Due Process.

---

[1] Both parties agree that, as a "just-cause" employee as defined in *Lytle v. Malady*, 485 Mich. 153, 164 (1998), Wuopio had a protected property interest in continuing public sector employment.  Thus, prong one of the *Leary* analysis is not at issue in this case.

21

The Eastern District of Michigan considered, and rejected, a similar argument by a publicly employed educator in *United States ex rel Diop v. Wayne County Community College District*, 242 F.Supp.2d 497 (E.D. Mich. 2003). In *Diop*, the Plaintiff was a part-time chemistry professor who alleged he was not promoted to full-time status because of his race. Like Wuopio, Diop also had a CBA which afforded him "the right to file a grievance to contest his failure to get the full-time chemistry position," *Diop*, 242 F.Supp.2d at 522, but chose not to avail himself of those rights. Faced with this factual scenario, the Court rejected Diop's claim:

> . . . [I]n *Parratt v. Taylor*, 451 U.S. 527 (1981), the Supreme Court held that in order to state a procedural due process claim under Section 1983, the plaintiff must show that the available state procedures were inadequate to compensate for the deprivation of the protected property interest. It is well-settled that a claim of lack of due process fails on the merits where there is a process available under state law. *Thus, where a plaintiff fails to avail himself of contractual grievance procedures or other available state remedies, he may not bring a federal claim of lack of due process.*

*Diop*, 242 F.Supp.2d at 521 (internal citations omitted)(emphasis added). A similar outcome was reached by the Third Circuit in *Leheny v. City of Pittsburgh*, 183 F.3d 220 (3d Cir. 1999). "Not availing themselves of the process [through their CBA] that was available to them, [the plaintiffs] may not complain now that they were deprived of due process of law." *Leheny*, 183 F.3d at 229.

In the instant case, the Defendants afforded Wuopio an opportunity to contest the charges brought by Miller against her in front of the Board. Further, the President of Wuopio's Union agreed that Wuopio could have brought a grievance under the CBA had she so chosen. Wuopio elected not to avail herself of these procedural rights, and under *Diop* any procedural due process claims she may have had are therefore waived.

22

In response, Wuopio argues that any proceedings before the Board would have been a sham, and therefore would not have comported with the requirements of due process. [Pl.'s Br., Doc. No. 75, p.18]. Aside from the fact that this argument does not address Wuopio's failure to file a grievance under the CBA, there is no evidence that any pre-termination hearing which would have been held before the Board would have been a sham.

A proceeding is not necessarily a sham solely because it is in front of the very people alleged to be depriving a plaintiff of due process. In *Duchesne v. Williams*, 849 F.2d 1004, 1005 (6th Cir. 1998)(en banc), the Sixth Circuit addressed the issue of whether a discharged municipal employee was required to receive a pre-termination hearing before a neutral and impartial decision maker rather than before the supervisor who is responsible for the employee's termination. The court concluded that such an employee was not entitled to a neutral and impartial decision maker at the pre-termination hearing. *Id*. at 1007.

Rather, the hallmark of a sham proceeding is where the outcome of the hearing was predetermined beforehand. Such was the case in *Wagner v. City of Memphis*, 971 F.Supp. 308, 319 (W.D. Tenn. 1997), where the outcome of plaintiff's "hearing was predetermined regardless of the proof presented. . . ." Such was also the case in *Bettio v. Village of Northfield*, 775 F.Supp. 1545, 1564 (N.D. Ohio 1991), where the pre-termination hearing was presided over by supervisory officials who had brought knowingly false charges against the employee. In this case, aside from her own speculation, Wuopio has come forward with no objective evidence that the pre-termination hearing Miller offered Wuopio before the Board would have been subject to a predetermined outcome.

Wuopio also argues that her resignation in August of 2006 amounted to a constructive

23

discharge - i.e., that the Defendants forced or coerced Wuopio's resignation.  The evidence in this case, however, does not support such a contention.

Employee resignations and retirements are presumed to be voluntary.  *Angarita v. St. Louis Community*, 981 F.2d 1537, 1544 (8th Cir. 1992).  This presumption remains intact until the employee presents evidence to establish that the resignation or retirement was involuntarily procured.  *Id*.

> If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights.

*Leheny*, 183 F.3d at 227.  *Leheny* noted two circumstances which deem an employee's resignation involuntary, however: 1) when the employer forces the resignation or retirement by coercion or duress; or 2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee.  *Id*. at 228.  At issue in the instant case is the first of these two circumstances.

Examining the law amongst the federal circuits, the Eleventh Circuit in *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995) described the inquiry into force or coercion by an employer as "whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign." *Hargray*, 57 F.3d at 1568.  Specifically, the Eleventh Circuit found that "resignations can be voluntary even where the only possible alternative to resignation is facing possible termination for cause . . . ." *Id*.  "Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff had a

24

choice.  Plaintiff could stand pat and fight." *Id.* (internal quotations omitted).

Just as in *Hargray*, here Wuopio alleges that she was faced with the choice of resigning or facing possible termination for cause by the Board.  *Hargray* found even the threat of criminal prosecution, coupled with a for-cause termination proceeding, does not render a resignation involuntary.  In the instant case, Wuopio has not evidenced a genuine issue of material fact that her resignation was involuntary due to a constructive discharge by the Defendants.

For these reasons the Court **GRANT**S the Defendant's motion for summary judgment with respect to Wuopio's alleged pre-termination deprivation of procedural due process.

B. Wuopio Waived Her Right to a Post-Termination Hearing.

Wuopio argues in her Complaint [Doc. No. 1, ¶82] that the Defendants violated her Due Process rights by not affording her a post-termination hearing.  It is undisputed, however, that Wuopio never requested such a hearing.

While no Sixth Circuit precedent is directly on point, the Eighth Circuit evaluated an analogous scenario in *Wisnowski v. City of Stephen*, 442 F.3d 1107 (8th Cir. 2006).  In *Wisnowski*, a terminated city police chief brought an action alleging the city violated his due process rights by not affording him a name clearing hearing after his termination.  *Wisnowski* at 1111.  The Eighth Circuit rejected the plaintiff's claim based on the fact that he had not requested such a hearing before filing suit:

> *Nothing in our jurisprudence suggests that a government employee can legitimately sue for deprivation of the right to a post-termination hearing where he never asserted the right before suing for damages.*  Allowing an employee to claim damages for being deprived or a hearing never requested would greatly expand government employers' potential liability and force such employers prophylactically to offer name-clearing hearings when it is not at all clear that the employee is entitled to - or even desires - one.

25

*Id.* (emphasis added).  In the instant case, Wuopio brings a claim for damages based upon the

Defendants' failure to afford her a post-deprivation hearing.  Furthermore, just as in *Wisnowski*,

Wuopio brings her claim without first having asked for such a hearing.  The Court adopts the

holding of the Eighth Circuit in *Wisnoski*, and **GRANTS** summary judgment on Wuopio's Due

Process claim with respect to the post-deprivation issue.

CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendants' Motion with respect to

Wuopio's First Amendment Retaliation Claim [Count I], and with respect to the Defendants'

claimed entitlement to qualified immunity.  However, the Court **GRANTS** the Defendants'

Motion [Doc. No. 51] regarding Wuopio's *Monell* claim against the School District [Count I], as

well as on Wuopio's Employee Right to Know Act and Procedural Due Process Claims [Counts

II and III].

**IT IS SO ORDERED.**

                               S/Sean F. Cox
                               Sean F. Cox
                               United States District Judge

Dated:  September 2, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on
September 2, 2009, by electronic and/or ordinary mail.

                               S/Jennifer Hernandez
                               Case Manager